IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DIANE CHRISTIAN and CASEY CHRISTIAN, wife and husband, | ) ) ) | No. 32578-4-III |
| Appellants, | ) ) ) | |
| v. | ) ) | |
| | ) | PUBLISHED OPINION |
| ANTOINE TOHMEH, M.D., and "JANE DOE" TOHMEH, husband and wife, and the marital community composed thereof; PROVIDENCE HEALTH CARE, a Washington business entity and health care provider; HOLY FAMILY HOSPITAL, a Washington business entity and health care provider; ORTHOPAEDIC SPECIALTY CLINIC OF SPOKANE, PLLC, a Washington business entity and health care provider; and DOES 1-5, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — We face again the question of whether a patient presented essential expert testimony to defeat her physician's summary judgment motion in a case in which the patient claims a lost chance of a better outcome because of an alleged breach in the standard of care by the physician. The patient in our appeal also pleads the tort of

outrage, a cause of action unusual in the patient-physician setting. The trial court granted the physician summary judgment and dismissed both causes of action. The major question on appeal is whether the patient, in response to a summary judgment motion, must provide expert testimony particularizing or describing the nature of the better outcome in addition to offering a percentage for the chance of the improved outcome. We answer the question negatively. Thus, we reverse the judgment in favor of the physician on the medical malpractice claim. We affirm the judgment dismissing the claim of intentional infliction of emotional distress.

## FACTS

Plaintiffs are Diane and Casey Christian, wife and husband. For ease in reading, we refer to the plaintiffs only as Diane Christian, the patient of defendants Dr. Antoine Tohmeh and Orthopaedic Specialty Clinic of Spokane, PLLC (Clinic). Tohmeh was a physician employed by the Clinic. We refer to the defendants collectively as Dr. Tohmeh.

Dr. Antoine Tohmeh performed laminectomies on Diane Christian's lower back on December 5, 2005. According to Christian, Dr. Tohmeh must have caused damage to her cauda equina, a bundle of nerves in the low back, during the surgery. She does not argue that Tohmeh breached the standard of care when initiating damage to the cauda equina. She instead contends that her postoperative symptoms should have alerted Tohmeh to the possibility of damage and led Tohmeh to perform another surgery to

2

explore if the cauda equina suffered damage. In turn, Christian maintains that postoperative surgery would have increased her chances for a healthier recovery by forty percent. Although neither party discusses the nature or ramifications of postoperative surgery, presumably the surgery might have allowed Dr. Tohmeh to discover and repair any damage to the cauda equina. Diane Christian sues for a loss of a better chance of recovery from surgery.

The principal question on appeal is whether Diane Christian presented expert testimony sufficient to overcome Dr. Antoine Tohmeh's summary judgment motion. Although we present the facts and the testimony that picture Christian's case in the best light, we also detail some of the opinion testimony favorable to Dr. Tohmeh.

Plaintiff Diane Christian experienced chronic low back pain and weakness in her legs. On April 14, 2005, defendant Dr. Antoine Tohmeh evaluated Christian to address her continuing symptoms. Christian's general physician, Dr. Richard Parker, requested the evaluation.

During the April 14 appointment, Diane Christian complained about pain in both legs, with the pain focused in the front thighs. The thighs also suffered numbness. Christian could not walk two blocks without assistance. Christian then encountered no bowel or bladder disturbance. We mention the lack of bowel and bladder problems because Christian underlines her suffering from bowel and bladder difficulties, after the surgery performed by Dr. Antoine Tohmeh, as evidence of cauda equina that should have

3

led to a second surgery to repair damage to the cauda equina.

After he reviewed Diane Christian's MRI (magnetic resonance imaging) and an X ray of her lower back, Dr. Antoine Tohmeh diagnosed Christian with two bulging discs and severe and abnormal narrowing of the spinal canal at multiple levels in the thoracic and lumbar regions of the spine. Medicine labels abnormal narrowing of the spinal canal as stenosis. On April 14, Tohmeh spoke at length with Christian and her husband about her options for achieving pain relief. Christian understandably wished minimally invasive surgery. Dr. Tohmeh explained, however, that given the abnormalities at multiple levels of her spine, an open, invasive surgery would be more expedient and efficient. At the conclusion of the April 14 consultation, the physician and patient decided to forgo immediate surgery and instead pursue a course of epidural spinal injections and physical therapy.

Between April and October 2005, Diane Christian underwent three epidural injections, which provided excellent, but temporary, pain relief. On October 18, 2005, Dr. Antoine Tohmeh evaluated Christian again. Christian reported continuing pain in both legs from the anterior thigh down to her knees, but not in her abdomen or groin. She recounted three recent falls. Christian did not report any bowel or bladder trouble. Christian, her husband, and Tohmeh again discussed her options. Dr. Tohmeh again recommended invasive surgery to resolve the symptoms at many levels of the spine. Christian consented to laminectomies.

4

On December 5, 2005, Dr. Anotine Tohmeh performed on Diane Christian partial L-2, complete L-3, complete L-4, and complete L-5 laminectomies. "L" stands for the lumbar spine, and the number attached to the "L" refers to the level of the lumbar spine with the lower number corresponding to a higher level. A laminectomy removes or trims the lamina of the vertebra to widen the spinal canal and create more space for the spinal nerves. Tohmeh also performed bilateral partial facetectomies and foraminotomies of the L-2, L-3, and L-4 nerve roots. The latter two procedures release pressure on the spinal nerves. During the surgery, Dr. Tohmeh accidentally punctured Christian's dura, a thick membrane surrounding the spinal cord. The puncture resulted in leaking of spinal fluid. Tohmeh sutured the needle-sized puncture wound completely to render the area "watertight." Clerk's Papers (CP) at 471. Christian does not contend that the puncture caused cauda equina syndrome. Christian tolerated the surgery well.

While recovering from surgery, Diane Christian experienced symptoms from which she did not earlier suffer. Christian reported tingling and numbness in her feet, pain in her buttocks, an inability to urinate and defecate, and a loss of sensation in her vagina and perineum. She rated the pain in her buttocks as a seven out of a possible ten. Christian also reported muscle spasms that impeded her ability to perform physical therapy. Hospital staff placed a Foley catheter into Christian's bladder to monitor urinary function.

On December 8, 2005, hospital staff removed the Foley catheter. Diane Christian then attempted to void her bladder on her own, but could not do so completely. Bladder scans revealed that Christian retained between 400 and 500 ml of urine and could only void between 100-200 ml at a time. On December 9, hospital staff reinserted a catheter in Christian, and the tube finally enabled her to completely void her bladder. Dr. Antoine Tohmeh discharged Christian, with the catheter inserted, the same day. Tohmeh then instructed Christian to return to the hospital for removal of the catheter once she could void normally at home. Tohmeh prescribed in-home nursing care to monitor Christian's urinary output.

On December 13, 2005, Dr. Antoine Tohmeh referred Diane Christian to Dr. Michael G. Oefelein, an urologist in Spokane. Dr. Oefelein diagnosed Christian with urinary retention, constipation, and grade I cystocele. A cystocele is the weakening of the supportive tissues between the bladder and vagina. Dr. Oefelein recommended Christian take Flomax and conduct a voiding trial. On December 14, Oefelein saw Christian again and performed an ultrasound. The ultrasound revealed that Christian retained 220 cc of urine in her bladder after attempting to void. Oefelein instructed Christian to continue taking Flomax and to return to him in four weeks, or sooner if she was unable to void.

On January 3, 2006, Diane Christian underwent a postoperative examination by Dr. Antoine Tohmeh. By January 3, the December 5 surgery had rid Christian of thigh

weakness and pain. Christian, nonetheless, suffered from a multitude of other symptoms, such as constipation, inability to fully void her bladder, and numbness in her left buttock, rectum, vagina, left leg, and right foot. Christian told Tohmeh that she stopped taking the Flomax prescribed by Dr. Oefelein, after which she encountered increased difficulty voiding her bladder. Dr. Tohmeh noted on his January 3 chart notes:

> Diane is recovering from her lumbar laminectomy. She has a multitude of symptoms. This could be related to chronic deconditioning and previous lack of activity as she was limited by her thigh pain and weakness and therefore would not walk enough to have foot symptoms. She recently went to Costco and walked around for about 20 minutes; she had to sit down because of foot pain. Prior to surgery she would use a shopping cart and lean over it when at the store. Overall, she has made some progress but needs water therapy for reconditioning. I also gave her a prescription for Cymbalta to hopefully improve her dysesthetic symptoms in the left buttock and left leg.

CP at 522. As a result of the January 3 symptoms, Tohmeh referred Christian again to urologist Michael Oefelein and to a colorectal specialist.

On January 4, 2006, Dr. Michael Oefelein evaluated Diane Christian again. Dr. Oefelein conducted a pelvic examination and found Christian still experienced perineal numbness. Christian reported frequent urination, including voiding throughout the night. Oefelein described Christian's condition as "neurogenic bladder with urinary retention status post multilevel lumbar laminectomy." CP at 197. An ultrasound of Christian's bladder after urination showed she only retained 36 cc of urine. Thus, Oefelein concluded that Christian's urinary retention had resolved. He instructed Christian to

7

decrease her fluid consumption to reduce frequent urination and to return in three to six months if she experienced bladder difficulties again.

On February 7, 2006, Diane Christian returned to Dr. Antoine Tohmeh. Christian complained of continuing numbness of the left buttock, rectum, and vagina. She described a sensation like a tourniquet around the left foot and complained of numbness in the foot.

During the February 7 examination, Dr. Antoine Tohmeh observed resolution of Diane Christian's presurgery back symptoms. Tohmeh reviewed a note prepared by Dr. Michael Oefelein on January 4 that stated Christian's urinary retention was resolved. Christian told Tohmeh that her bladder symptoms are tolerable and need not be addressed. Christian complained instead of vaginal numbness, and she told Tohmeh that she could not feel an inserted tampon. Christian reported severe constipation for which her primary physician prescribed Miralax. Tohmeh told Christian that her symptoms could relate to inactivity, pain medications, and anesthesia. Dr. Tohmeh referred Christian to Dr. Shane McNevin for a bowel workup and Dr. Larry Lamb for a nerve conduction study on her left leg.

On February 27, 2006, Dr. Larry Lamb conducted a nerve study on Diane Christian. The study detected no abnormality that would cause either incontinence or pain in the buttocks, perineum, and thighs. Nevertheless, the study did not monitor nerves at the S3-S5 level of Christian's spine, the area of the cauda equina.

8

On March 2, 2006, Dr. Antoine Tohmeh sent a letter to Diane Christian regarding concerns she expressed in the meantime to Tohmeh's assistant. Tohmeh explained to Christian that both the nerve study and an urologist report established that the nerves that might cause her symptoms functioned normally. Dr. Tohmeh concluded his letter by noting that none of the testing presented objective reasons for Christian's pain and discomfort. Tohmeh, however, referred Christian to a gynecologist for another evaluation and reminded her that Dr. McNevin had yet to perform the bowel evaluation.

On March 9, 2006, Dr. Shane McNevin conducted a segmental colonic transit time study. The study measures flow in the colon and can detect constipation. Dr. McNevin concluded that Diane Christian had a global abnormal delay in colon transit. McNevin recommended physical therapy for pelvic floor rehabilitation.

On March 16, 2006, Diane Christian and her husband returned to Dr. Antoine Tohmeh. Christian expressed disappointment with Tohmeh. Christian stated she wished she had not undergone the laminectomies since her postoperative symptoms exceeded her preoperation pain.

During the March 16 conference, Diane Christian declared her belief that she developed cauda equina syndrome. The cauda equina, Latin for "horse's tail," is a bundle of spinal nerves and nerve roots in the lower back. The nerves innervate the pelvic organs, perineum, bladder, sphincter muscles, hips, and legs. Cauda equina syndrome constitutes a serious neurologic condition in which damage to the cauda equina

9

causes loss of function of nerve roots in the lower spinal canal. Cauda equina syndrome results in severe back pain, numbness in the perineum, vagina, and anus, bladder and bowel dysfunction, sexual dysfunction, pain radiating into the legs, and gait disturbance.

During the March 16 meeting between patient and physician, Dr. Antoine Tohmeh disagreed with Diane Christian's self-diagnosis because her leg pain and weakness subsided significantly after the surgery and Christian never suffered from "overflowing" bowel or bladder incontinence. Tohmeh urged Christian to visit his recommended gynecologist and undergo the physical therapy prescribed by Dr. Shane McNevin. Christian declined Tohmeh's referral to a gynecologist. She handed Tohmeh a letter memorializing her grievances and concerns about her health. Tohmeh recommended that Christian see another physician for a second opinion and ordered an MRI to provide the second doctor with a complete evaluation.

During the March 16 conference, Dr. Antoine Tohmeh raised his voice defensively and interrupted Diane Christian and her husband when they questioned Tohmeh's conclusion that Christian lacked any neurological symptoms. In her deposition, Christian averred that Dr. Tohmeh yelled words to the effect of "[T]here['s] nothing wrong with you!" CP at 187. Casey Christian testified during his deposition that Dr. Tohmeh raised his voice when Diane challenged Tohmeh and insisted that she developed cauda equina syndrome. Tohmeh corrected himself and apologized for raising his voice. Diane Christian attested that neither she nor her husband grew angry during

10

the appointment with Tohmeh.

By the end of the March 16 meeting, Diane Christian concluded that her patient relationship with Dr. Tohmeh had ended since he insisted she had no injury. Dr. Tohmeh, however, never declared the doctor-patient relationship terminated.

On April 1, 2006, Diane Christian underwent an MRI of her lumbosacral spine. The images showed no abnormalities that would explain Christian's persistent symptoms.

In April 2006, Richard Parker, Diane Christian's primary care physician, referred her to physiatrist Vivian Moise. Dr. Moise found Christian's symptoms to be "highly consistent with a diagnosis of cauda equina injury." CP at 123. Moise opined that the results of the nerve conduction study did not preclude a finding of cauda equina syndrome because Christian's cauda equina symptoms lie in the S3, S4, and S5 dermatome and myotome muscles and the conduction study did not address those muscles. Moise believed Christian experienced neurologic impairment.

As a result of the April 2006 examination of Diane Christian, Dr. Vivian Moise ordered urodynamic testing and performed a rectal examination. According to Moise, the May 1 test and examination confirmed that Christian had cauda equina syndrome. Dr. Moise spoke with Dr. Tohmeh and shared her diagnosis with him. Tohmeh replied that Christian experienced significant emotional or psychologic issues that called into question her complaints. During her deposition, Moise declared that Tohmeh objected angrily and strongly to her diagnosis of cauda equine syndrome.

PROCEDURE

Diane Christian filed suit against Antoine Tohmeh. Christian alleged that Dr. Tohmeh violated the applicable standard of care by failing to provide "immediate and emergency medical intervention" to address Diane's postsurgical symptoms. CP at 6. Christian also alleged that Dr. Tohmeh "negligently or intentionally failed to order 'medical testing' of [Ms. Christian] that would [have] more definitively diagnose[d] or rule[d] out cauda equina syndrome." CP at 15. Christian further alleged that Tohmeh sought to obfuscate her symptoms in order to avoid legal liability, which conduct constituted outrageous and extreme conduct. In essence, Christian pled medical malpractice resulting in a lost chance of a better outcome and the tort of outrage.

This case in part entails a battle of medical experts. Diane Christian retained Dr. Stanley Bigos, an orthopedic surgeon, as an expert witness. Dr. Bigos opined that Diane Christian suffered from cauda equina syndrome, although he did not know what caused the syndrome. He testified that based on his education, training, background, experience, and his review of Christian's file, Dr. Tohmeh breached the applicable standard of care in his postoperative treatment of Christian. He testified that Christian's postoperative symptoms should have aroused suspicion in Dr. Tohmeh as to lead him to review and monitor her full neurologic picture.

In a critical passage in his deposition, Dr. Stanley Bigos testified:

Q Regardless of whatever an MRI might have shown back at that time, was Dr. Tohmeh obligated to go ahead and operate on a patient like this based on her postoperative complaints in December of '05?

A Her postoperative complaints, yes.

Q So even if he had a clean MRI he still had to take her to surgery?

A I think that's the prudent thing to do.

Q And he would tell her beforehand that she needs to be explored and has a 40 percent chance of achieving some improvement in her condition for reasons that we don't understand?

A Yeah. That's right.

CP at 694.

Dr. Bigos explained further:

A ... If we have somebody with findings, we get an MRI. The MRI doesn't show anything obvious, we will still decompress it or go back in to make sure that the imaging didn't miss something, period.

And, like I said, a fair enough of times you'll go in and you really don't see anything. You say, well, it might be this or it might be that. You close it back up. And you still get the improvement on some number of patients.

Q What percentage of your patients had some kind of neurological symptom like toe tingling or something postoperatively?

A Between 25 and 50 percent, I would suppose.

Q And what percentage of those patients did you take back to surgery because they had that symptom?

A Hardly any. That's not—there's a ratcheting up, like DEFCON 1, 2, 3, 4 and 5. Changes in neurologic exam, like tingling in the toes, would only be DEFCON 1. It's really ratcheting up your index of suspicion saying I'll do more on the physical examination and figure out what's going on the best I can.

Once you start getting into saddle symptoms, bladder and bowel symptoms, then you're there. The onus is really on you to say this is outside the paradigm of postoperative care. This is in the paradigm of something potentially serious with the patient.

. . . .

Q Just real quickly. Can you summarize your opinion about standard of care of Dr. Tohmeh.

13

A Well, the only thing I can do is review the facts. One, we've got a cauda equina syndrome. We've got a patient who has significant difficulties related to the S2-3-4 nerves, okay, if you want to be specific. They came on during the postoperative care after her surgery. We saw the progression I already mentioned about going from tingling, DEFCON 1, to 2, 3, 4 and 5. And she was sent home with a Foley catheter, without an MRI, and she has a bad result.

Bottom line is that I—that's below the standard of care.

Q And so do you believe there was a breach of standard of care that caused harm?

MR. KING [Defense counsel]: Objection. Lacks foundation.

BY MR. RICCELLI [plaintiff's counsel]:

Q Do you believe there was a breach of standard of by care [sic] Dr. Tohmeh in the exercise of his obligation as a surgeon with Ms. Christian?

A I believe, from the facts that I have available to me, that that does not meet the standard of care that people expect when they come to the hospital.

Q Based on your education, training, background and experience?

A Yes.

Q And is that more probable than not your opinion?

A That's more probable than not my opinion.

Q Do you believe that had Dr. Tohmeh taken her back into surgery to decompress or to explore that she would have an opportunity or chance at a better outcome?

MR. KING: Objection. Foundation.

. . . Bottom line is that it may have done nothing. It may have improved her a little bit. Or it may have totally alleviated it. That's the experience in the literature, and that's all we really have to go on.

CP at 696-97.

Dr. Bigos then testified that, if Dr. Antoine Tohmeh immediately returned Diane Christian to surgery, Christian had a forty percent chance of decreased symptoms. Bigos, based on medical literature, could not better Christian's forty percent chance of improvement due to the infrequency of the variety of complications experienced by

14

Christian.

> Q So if Dr. Tohmeh complied with the standard of care and took the patient to surgery after an MRI which didn't show anything, more likely than not there would have been no change in her neurologic status, because 60 percent of the time the surgery doesn't do any good?
>
> A You could state it that way, but the bottom line is when we're—if you're driving along the road and there's a curve and there's a 500-foot drop, you drive a little slower around that curve.
>
> Q But the data tells us—
>
> A The data is totally incomplete to tell us what those percentages are. When we're talking about three out of five people, the P value goes out the window as far as being able to say anything statistically.
>
> Q But you're using the same data for 40 percent that I'm using for 60 percent, right?
>
> A The 60/40 is there. But the 60/40 could not be confirmed with the information that we had.
>
> Q So all we're left to do is speculate then? Is that what you're saying?
>
> A That's right.
>
> Q Okay.
>
> A We'll put our hands in our pockets and wear suspenders and a belt.
>
> Q The current data, even though it's speculative, says more often than not surgery will not do any good?
>
> A Well, there isn't current data. There's smatterings of different things. Nobody has put it together and looked at the quality of different things. I use 40 percent because that's the best I can derive from the literature with specks of everybody's inexperience with four of them per career. I can't do 60/40 because I had only four.

CP at 147-48. Dr. Bigos also testified that it was not possible for him to determine with certainty if Diane Christian would have fallen into the forty percent of patients that experience improvement after a second corrective surgery.

Diane Christian also retained Dr. Richard E. Seroussi of Seattle Spine & Sports

Medicine to examine her for litigation purposes. Dr. Seroussi diagnosed Christian with cauda equina syndrome, multilevel bilateral lumbar radiculopathy, neurogenic bladder dysfunction, neurogenic bowel dysfunction, impaired balance, impaired daily activities, dysphoria, decreased vocational potential, and a preexisting history of obesity, significantly worsened by complications from the laminectomies. Seroussi determined that Christian had a poor prognosis of her body returning to normal function and, while the symptoms might lessen over time, her injuries were chronic. Christian maintains that Seroussi testified that Dr. Antoine Tohmeh breached the standard of care in his postsurgical treatment of her. A deposition excerpt established that he intended to testify to the standard of care, but the record lacks such testimony. Dr. Seroussi declared that Christian exhibited new neurologic deficits after surgery. Seroussi also remarked that lack of intensive pain and an absence of incontinence, factors that Tohmeh used to rule out cauda equina syndrome, would not have surfaced after the surgery due to Christian's heavy ingestion of pain medication and extended use of a Foley catheter.

Dr. Antoine Tohmeh moved for partial summary judgment. In support of his motion, Tohmeh offered deposition testimony from his expert, Dr. Jeffrey Larson, a neurosurgeon. Dr. Larson testified that Diane Christian's immediate postoperative symptoms could have also been the result of irritated nerve roots caused by an increased blood flow to the cauda equina. He also testified, contrary to the opinions of Dr. Moise, Dr. Bigos, and Dr. Seroussi, that Christian never developed cauda equina syndrome. Dr.

Larson supported Dr. Tohmeh's conclusion that a lack of weakness in Christian's legs strongly indicated that she did not suffer from the syndrome.

The trial court granted Dr. Tohmeh's motion for summary judgment "in total" and dismissed all claims with prejudice. CP at 220. In a written ruling, the trial court concluded that Diane Christian failed to satisfy her burden of proof on summary judgment as to the standard of care or proximate cause. The written ruling made no comment on the deficiencies of Christian's claim for intentional infliction of emotional distress.

Diane Christian moved for reconsideration. In the motion, Christian argued that the trial court committed legal error. Christian also asked the trial court to consider newly discovered evidence. The new evidence was a supplemental declaration from Dr. Stanley Bigos, a declaration of Dr. Robert Pearlman, and the deposition of defense expert witness, Dr. Jeffrey Wang. Christian could not depose Dr. Wang until after the summary judgment motion hearing.

In his deposition, Dr. Jeffrey Wang testified to the standard of care to which a back surgeon should be held when a patient encounters the postoperative symptoms experienced by Diane Christian. Dr. Wang testified that he reviewed Christian's hospital charts and concluded Dr. Tohmeh had no reason to order an imaging study before he discharged Diane Christian on December 9, 2005. Wang, however, testified that the standard of care required Tohmeh to order and review postoperative X rays of the patient

17

after laminectomies. Dr. Wang also averred that he would perform postoperative

exploratory surgery with patients who exhibited pain disproportionate to the initial

procedure.

Dr. Stanley Bigos' declaration reiterated that Diane Christian would have had a

forty percent chance of diminished symptoms if Dr. Antoine Tohmeh performed

immediate postoperative exploratory surgery. Bigos averred:

> My deposition testimony was based upon my general knowledge of
> the literature as of that time, and coupled with the experience I had with
> similar situations during my practice. I understand there may be concern
> about the meaning of my testimony as contained on pages 83 and 84 of my
> deposition, but I believe careful reading of the transcript should dispel any
> confusion. I believe I set out the medical profession's understanding of the
> literature, and basic medical knowledge of human anatomy and physiology,
> collectively upon which physicians routinely rely to guide their daily
> practice. This results in an approximate 40 percent likelihood or
> probability of a better outcome. It was this 40 percent chance of
> improvement and related urgency that was the basis for requiring Cauda
> Equina symptoms to be a "Red Flag" emergency, to be explicitly ruled out,
> before returning Ms. Christian to ordinary post[]surgical care for back
> problems. This is, according to AHCPR Guide #14, comprised of the
> systematic review of the literature with 23 national consultants and 7
> international experts from 19 different disciplines.

CP at 238.

Dr. Robert Pearlman is a professor of medicine at the University of Washington

and the Chief of Ethics Evaluation at the National Center for Ethics in Healthcare. In his

declaration, Pearlman faulted Dr. Antoine Tohmeh for deficiency in medical charting.

Pearlman stated that Dr. Tohmeh may have violated ethical standards by failing to

18

provide Diane Christian of information that she suffered from cauda equina syndrome, dissuading her from believing she suffered from the syndrome, and discouraging her from seeing another physician.

The trial court denied Diane Christian's motion for reconsideration. The order denying the motion mentions that the court read the supplemental pleadings filed by Diane Christian. The order, however, does not indicate whether the trial court considered the evidence in the pleadings as newly discovered evidence and evidence to consider when determining whether to grant the motion for reconsideration.

## LAW AND ANALYSIS

### Motion for Reconsideration and Evidence on Appeal

Before addressing the merits of Diane Christian's appeal, we must determine what evidence to consider when deciding whether the evidence defeats Dr. Antoine Tohmeh's summary judgment motion. As part of a motion for reconsideration, Christian asked the trial court to consider the deposition of Jeffrey Wang, the declaration of Robert Pearlman, and a supplemental declaration of Stanley Bigos. The trial court denied the motion, but we do not know if the court excluded the additional testimony from contemplation when denying the motion.

On appeal, Diane Christian assigns error to the denial of the motion for reconsideration and thus asks this court to include the Jeffrey Wang, the Robert Pearlman, and the additional Stanley Bigos testimony in our calculation of whether the

summary judgment order should be affirmed. We decline to address this assignment of error because Christian did not adequately brief the law attendant to the assignment. Thus, we refuse to consider the late filed testimony.

Diane Christian restricts her argument on appeal. Although she assigns error to the order denying the motion for reconsideration, the content of the argument comprises one statement articulating the standard of review and a general statement that all arguments against the grant of summary judgment should encompass the argument against denial of the motion for reconsideration.

Diane Christian did not follow RAP 10.3. RAP 10.3(a)(6) directs that an appeal brief include:

> The argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record.

To enforce the rule, this court does not review issues not argued, briefed, or supported with citation to authority. *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012). We do not consider conclusory arguments. *Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021, 297 P.3d 708 (2013). Passing treatment of an issue or lack of reasoned argument is insufficient to merit appellate review. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

A thorough analysis and citation to authority is particularly needed for us to consider Diane Christian's claimed error in the trial court's denial of her motion for reconsideration. CR 59(a) lists nine grounds on which a trial court may reconsider a decision. Diane Christian sought reconsideration on four grounds. Those grounds, with their language from CR 59(a), are:

> (4) Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial;
> . . . .
> (7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law;
> (8) Error in law occurring at the trial and objected to at the time by the party making the application; or
> (9) That substantial justice has not been done.

This court reviews a trial court's decision to grant or deny a motion for reconsideration for abuse of discretion. *Davies v. Holy Family Hosp.*, 144 Wn. App. 483, 497, 183 P.3d 283 (2008).

On appeal, Diane Christian does not identify upon which of the four reconsideration grounds she relies, nor does she provide any analysis to assist us in declaring one of the grounds germane. In her briefs, Christian cites to the subsequent declaration of Dr. Stanley Bigos and the deposition testimony of Dr. Jeffrey Wang, and she assumes we will consider the testimony. Nevertheless, Christian does not address whether the evidence was newly discovered and whether the evidence could not have reasonably been supplied to the trial court before entry of the summary judgment order.

21

Lost Chance of Better Outcome

Diane Christian argues that the trial court erred in dismissing her claim for lost chance of a better outcome. Dr. Antoine Tohmeh contends that the trial court correctly granted summary judgment because no reasonable juror could conclude that Christian developed cauda equina syndrome or that Tohmeh violated the standard of care by not diagnosing or treating the condition. Dr. Tohmeh further argues that Christian failed to provide expert testimony as to the nature of the better outcome alleged, and Tohmeh contends that such proof is essential to defeat a summary judgment motion. We side with Diane Christian. The supplemental testimony filed by Christian in support of a motion for reconsideration was not necessary to defeat a summary judgment motion. The deposition testimony of Dr. Stanley Bigos filed to initially oppose the motion suffices. Testimony of Drs. Richard Seroussi and Vivian Moise bolsters proof of some of the elements of Christian's claim.

Washington, in line with other jurisdictions, recognizes a lost chance claim, a tweaked version of a medical malpractice cause of action. A lost chance claim is not a distinct cause of action but an analysis within, a theory contained by, or a form of a medical malpractice cause of action. *Rash v. Providence Health & Servs.*, 183 Wn. App. 612, 630, 334 P.3d 1154 (2014), *review denied*, 182 Wn.2d 1028, 347 P.3d 459 (2015).

Lost chance claims can be divided into two categories: lost chance of survival and lost chance of a better outcome. *Herskovits v. Grp. Health Coop. of Puget Sound*, 99

22

Wn.2d 609, 624, 664 P.2d 474 (1983); *Mohr v. Grantham*, 172 Wn.2d 844, 857, 262 P.3d 490 (2011); *Rash v. Providence Health & Servs.*, 183 Wn. App. at 630. Diane Christian complains that Antoine Tohmeh decreased her chances of a better outcome. In a lost chance of a better outcome claim, the chance of a better outcome or recovery was reduced by professional negligence. *Mohr v. Grantham*, 172 Wn.2d at 857 (2011); *Rash*, 183 Wn. App. at 631. In a traditional medical malpractice case, a professional's negligence likely led to a worse than expected outcome. *Rash*, 183 Wn. App. at 631. Under a lost chance of a better outcome theory, the bad result was likely even without the health care provider's negligence, but the malpractice reduced the chances of an improved result by a percentage of fifty percent or below. *Rash*, 183 Wn. App. at 631.

Washington lost chance decisions were decided with the backdrop of Washington's 1976 health care act that covers actions for injuries resulting from health care. Ch. 7.70 RCW. Under RCW 7.70.030: "Unless otherwise provided in this chapter, the plaintiff shall have the burden of proving *each fact essential* to an award by a *preponderance of the evidence.*" (Emphasis added.) One essential element is that the health care provider's "failure was a *proximate cause of the injury complained of.*" RCW 7.70.040(2) (emphasis added). Based on *Herskovits v. Group Health* and *Mohr v. Grantham*, a plaintiff need not forward medical testimony that negligence of the health care provider was the likely cause of injury. *Rash*, 183 Wn. App. at 636. But, the

23

plaintiff must provide a physician's opinion that the health care provider "likely" caused a lost chance of a better outcome. *Rash*, 183 Wn. App. at 631.

A review of familiar summary judgment principles is as important to this appeal as a discussion of the substantive law of a lost chance of a better outcome. Appellate courts review a trial court's order granting summary judgment de novo. *Briggs v. Nova Servs.*, 166 Wn.2d 794, 801, 213 P.3d 910 (2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c); *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). We construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

Expert testimony is required to establish the standard of care and most aspects of causation in a medical negligence action. *Seybold v. Neu*, 105 Wn. App. 666, 676, 19 P.3d 1068 (2001). In a lost chance suit, a plaintiff carries the burden of producing expert testimony that includes an opinion as to the percentage or range of percentage reduction of the better outcome. *Herskovits v. Grp. Health Coop. of Puget Sound*, 99 Wn.2d at 611 (1983); *Mohr v. Grantham*, 172 Wn.2d at 849 (2011); *Rash v. Providence Health & Servs.*, 183 Wn. App. at 636 (2014).

24

Dr. Antoine Tohmeh first argues that Diane Christian failed to present evidence that she suffered from cauda equina syndrome. Tohmeh notes that no expert witness testified on behalf of Christian that a postoperative hematoma, a dural graft, or any conduct by Dr. Tohmeh during the surgery led to the syndrome. Tohmeh suggests that Christian did not exhibit any of the cardinal signs or symptoms of cauda equina syndrome while recovering in the hospital. He emphasizes testimony that an imaging study six months after the surgery showed no bleeding, hematoma, or arachnoiditis and that this negative imaging ruled out cauda equina syndrome. Tohmeh contends that none of the specialists to whom he referred Christian diagnosed cauda equina syndrome. He then maintains, based on the testimony of his own expert witness, Dr. Jeffrey Larson, that no reasonable person could conclude that Christian developed cauda equina syndrome.

Antoine Tohmeh looks into a large crowd and see only his friends. For purposes of summary judgment, he may not limit the record to the opinions of his expert or specialists to whom he referred Diane Christian. We may not weigh which physician's or physicians' testimony is more credible. Drs. Stanley Bigos, Richard Seroussi, and Vivian Moise testified that Christian developed cauda equina syndrome.

We do not find any passage in which one of Diane Christian's experts directly declared that the lower back surgery caused the syndrome. Dr. Stanley Bigos testified that he did not know what caused the cauda equina syndrome, but one should not conclude that he ruled out the syndrome developing during the laminectomies. A

25

reasonable inference from his testimony is that Bigos did not know what conduct during the surgery caused the syndrome, despite the syndrome developing during the surgery. Drs. Bigos, Seroussi, and Moise commented that Christian suffered from postoperative symptoms. The term "postoperative" infers that symptoms occurred during the operation. The inferences from all three physicians' testimony inescapably lead to a conclusion that the cauda equina syndrome resulted from the low back surgery. Under summary judgment principles, this court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Barber v. Bankers Life & Cas. Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972).

Although testimony supports that the cauda equina syndrome occurred as a result of the December 5, 2005, surgery, such testimony is not indispensable. Diane Christian and her experts criticize Dr. Tohmeh for failing to attend to Christian's symptoms that appeared after the surgery. The reasonable inference may be drawn that the experts would opine that Tohmeh failed to properly care for Christian after the surgery regardless of whether the symptoms were causally related to the surgery. Christian exhibited cauda equina syndrome symptoms that demanded immediate exploration.

Dr. Antoine Tohmeh next argues that Diane Christian presented no testimony to establish that he violated the standard of care. In so arguing, Tohmeh underscores that no physician testified that he violated the standard of care during the surgery and that no

physician identified what action caused the cauda equina syndrome during the surgery. We agree, but Tohmeh's emphasis ignores the focus of Diane Christian's allegation and her expert's testimony. Christian contends Dr. Tohmeh violated the standard of care when rendering postoperative care, not in performing the surgery. Dr. Stanley Bigos testified to the applicable standard of care and that Tohmeh's postsurgical care of Christian fell below that standard. According to Bigos, Christian's symptoms should have led Dr. Tohmeh to perform a second exploratory surgery. Bigos further testified that Tohmeh's failure to order additional imaging of Christian's lower back and to conduct exploratory surgery deprived Christian of a forty percent chance of decreased symptoms.

Finally, Antoine Tohmeh astutely contends that Diane Christian fails to defeat the summary judgment motion because her expert, Dr. Stanley Bigos, did not specify what the better outcome would have been if Tohmeh conformed to the standard of care and performed an exploratory operation. We agree that Bigos did not identify those symptoms of cauda equina syndrome that had a forty percent chance of alleviation. He was never asked his opinion on this question in his deposition. Dr. Tohmeh further contends that Dr. Bigos testified that it would be pure speculation to say what the "better outcome" might have been. We disagree. Bigos' reference to speculation came in response to a different question in his deposition based on insufficient records of Christian's care.

27

Based on an absence of testimony as to the nature of the possible better outcome, Antoine Tohmeh contends that a jury could not apply the loss of chance formula to her damages. According to Dr. Tohmeh, the jury could not determine those symptoms that may have been reduced with the postoperative surgery. We recognize that a jury may wish to hear additional testimony from Dr. Stanley Bigos or another physician as to what symptoms of cauda equina syndrome might have been erased or reduced if Tohmeh complied with the standard of care. Nevertheless, Tohmeh advances no case and we find no case that demands a patient, in response to a summary judgment motion, qualify or quantify the extent or nature of damages incurred. For instance, in a traditional medical malpractice suit, the patient needs expert testimony that shows the breach of the standard of care caused some damage or injury, but the law does not require that the expert detail the precise pain and suffering caused by the defendant doctor's negligence. Absent such case law, we hold that a plaintiff need only provide testimony from a qualified expert that the violation of the standard of care caused some injury or reduced the chance of a better outcome by a stated percentage to survive a summary judgment motion. A physician need not particularize those symptoms that would have decreased.

Dr. Antoine Tohmeh's argument fails to recognize that Dr. Stanley Bigos could not definitively testify to the nature and extent of a better outcome, because the outcome depended on how quickly Tohmeh returned Diane Christian to surgery. The quicker the return, the better the outcome, such that the forty percent chance of a better outcome

28

could have entailed a complete recovery if Tohmeh returned Christian to surgery the following day.

Our holding conforms to general principles emanating from the law of damages in tort and other legal actions. The doctrine respecting the matter of certainty, properly applied, is concerned more with the fact of damage than with the extent or amount of damage. *Gaasland Co. v. Hyak Lumber & Millwork, Inc.*, 42 Wn.2d 705, 712-13, 257 P.2d 784 (1953); *Alpine Indus., Inc. v. Gohl*, 30 Wn. App. 750, 754, 637 P.2d 998, 645 P.2d 737 (1981). Damages are not precluded simply because they fail to fit some precise formula for measuring them. *Pugel v. Monheimer*, 83 Wn. App. 688, 692, 922 P.2d 1377 (1996). We are reluctant to immunize a defendant once damage has been shown merely because the extent or amount thereof cannot be ascertained with mathematical precision, provided the evidence is sufficient to afford a reasonable basis for estimating loss. *Jacqueline's Wash., Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 786, 498 P.2d 870 (1972); *Lewis River Golf, Inc. v. O.M. Scott & Sons*, 120 Wn.2d 712, 717, 845 P.2d 987 (1993); *Dep't of Fisheries v. Gillette*, 27 Wn. App. 815, 824, 621 P.2d 764 (1980).

Intentional Infliction of Emotional Distress

Diane Christian next contends that the trial court erred in dismissing her claim for intentional infliction of emotional distress or outrage. The tort of outrage is synonymous with a cause of action for intentional infliction of emotional distress. *Kloepfel v. Bokor*,

149 Wn.2d 192, 194, 66 P.3d 630 (2003); *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 250, 35 P.3d 1158 (2001).

In order to make a prima facie case of intentional infliction of emotional distress, a plaintiff seeking to survive summary judgment must produce evidence showing three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to the plaintiff of severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d at 195 (2003); *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). This appeal focuses on element one of the tort. Extreme and outrageous conduct must be conduct that the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim "'Outrageous!'" *Kloepfel*, 149 Wn.2d at 196 (internal quotation marks omitted) (quoting *Reid v. Pierce County*, 136 Wn.2d 195, 201-02, 961 P.2d 333 (1998)). Liability exists only when the conduct has been so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Grimsby*, 85 Wn.2d at 59 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).

Generally, the elements of a claim for intentional infliction of emotional distress are questions of fact. *Strong v. Terrell*, 147 Wn. App. 376, 385, 195 P.3d 977 (2008). On summary judgment, however, a trial court must make an initial determination as to whether the conduct may reasonably be regarded as so extreme and outrageous as to

30

warrant a factual determination by the jury. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 869, 324 P.3d 763 (2014); *Strong v. Terrell*, 147 Wn. App. at 385. No case suggests that the standard to defeat a summary judgment motion is harsher for plaintiffs asserting outrage claims than plaintiffs in other tort suits. Nevertheless, Washington courts, like other courts, have considered themselves gatekeepers for purposes of allowing a jury to decide claims of intentional infliction of emotional distress. The trial court and, in turn, the appeals court, renders an initial screening to determine whether the defendant's conduct and mental state, together with the plaintiff's mental distress, rise to the level necessary to make out a prima facie case. *Benoy v. Simons*, 66 Wn. App. 56, 63, 831 P.2d 167 (1992); *Orwick v. Fox*, 65 Wn. App. 71, 87-88, 828 P.2d 12 (1992). The requirement of outrageousness is not an easy one to meet. *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013). The level of outrageousness required is extremely high. *Reigel v. SavaSeniorCare LLC*, 292 P.3d 977, 990 (Colo. Ct. App. 2011).

In response to Diane Christian's intentional infliction of emotional distress claim, Dr. Antoine Tohmeh contends that his conduct was well within the standard of care and that no witness testified that his conduct met the high threshold for liability for intentional infliction of emotional distress. We disagree with the relevance of these twin arguments. Conforming to a physician's standard of care may be a factor to consider in an outrage suit against a doctor, but this factor does not control the outcome. Anyway, physicians testified that Dr. Tohmeh violated the standard of care. No case supports a rule that an

31

expert witness, or any witness, must characterize the defendant's conduct as outrageous in order to sustain a claim of intentional infliction of emotional distress.

We list the conduct of Dr. Antoine Tohmeh that Diane Christian contends was extreme and outrageous:

1. Engaging in a pattern of intentional behavior to obfuscate a true diagnosis of Christian's neurological deficits in an attempt to avoid legal liability;

2. Referring Christian to neurologist Dr. Larry Lamb but not ordering nerve conductions studies at the S3-S5 level, the nerves associated with cauda equina syndrome;

3. Yelling and shouting at Christian;

4. Telling Christian that she had no neurological deficits, her problems were all in her head, and whatever was wrong would have happened anyway;

5. Implying to Christian that she was lazy and obese;

6. Speaking angrily to Dr. Vivian Moise and attempting to influence her diagnosis of cauda equina syndrome;

7. Telling Dr. Moise that Christian suffered from significant emotional or psychological issues that rendered Christian's history less valid; and

8. Referring Christian to urologist Dr. Michael Oefelein, who found a neurogenic bladder, yet telling Christian that Oefelein's findings were normal.

Diane Christian likens the conduct of Dr. Antoine Tohmeh to physicians in *Doe v. Finch*, 133 Wn.2d 96, 942 P.2d 359 (1997) and *Grimsby v. Samson*, 85 Wn.2d 52 (1975). In *Finch*, Dr. Finch engaged in a sexual relationship with John Doe's wife, while Finch provided marital counseling for Doe and his wife. Our Supreme Court addressed whether the statute of limitations barred Doe's suit. The court did not analyze the merits of the claim for intentional infliction of emotional distress.

In *Grimsby*, Arne Grimsby allegedly watched his wife die in agonizing pain, while Dr. Werner Samson abandoned her care. On appeal, the Evergreen State Supreme Court recognized for the first time the tort of outrage or intentional infliction of emotional distress. The trial court dismissed the suit on a motion to dismiss pursuant to CR 12(b)(6) rather than a summary judgment motion. The court focused on whether Washington would recognize the tort. The Supreme Court reversed the dismissal, while recognizing that it needed to read Grimsby's complaint liberally.

We evaluate Diane Christian's claim of outrage by reviewing and comparing reported decisions primarily from other jurisdictions. In these cases, health care professionals behaved in ways similar to conduct about which Diane Christian complains. In all of the decisions, the appellate courts ruled that the plaintiff failed to show facts sufficient to sustain a cause of action because the health care professional's conduct was not outrageous. A review of the cases might lead one to ask if the conduct of a health care provider might ever be considered outrageous. Although the cases involve only one

33

or two of those behaviors attributed to Antoine Tohmeh rather than the full extent of the alleged extreme behavior, we conclude that aggregating the behavior in this context adds nothing to the analysis of whether Dr. Tohmeh's conduct was outrageous. Many of the decisions involve more disgraceful cumulative behavior. Therefore, we affirm the trial court's summary judgment dismissal of Diane Christian's intentional infliction of emotional distress action.

One Washington decision addresses whether conduct of a physician sustains a claim for intentional infliction of emotional distress. In *Benoy v. Simon*, 66 Wn. App. 56, 831 P.2d 167 (1992), Saundra Benoy sued neonatologist Robert Simon for intentional infliction of emotional distress. Benoy gave birth to a severely disabled premature child at Kadlec Medical Center in Richland, where Dr. Simon provided care. When the infant's condition deteriorated, Dr. Simon transferred him to Children's Orthopedic Hospital in Seattle, where the boy later died. Benoy contended that Simon needlessly pressured her family to create a guardianship, maintained the infant needlessly on life support, led her to believe her son's condition improved when it deteriorated, told her to bring her son's body home on a bus, and billed her for needless care. This court affirmed summary judgment in favor of Dr. Simon. Even assuming the events occurred as described by Benoy, the physician's conduct did not fall within the perimeters of outrageous conduct.

34

Courts in other jurisdictions have also reviewed suits for outrageous conduct against health care providers. In *Reigel v. SavaSeniorCare LLC*, 292 P.3d 977 (Colo. Ct. App. 2011), the plaintiff's husband died from a heart attack. The wife visited the husband in the nursing home, during which visit the husband exhibited signs of an attack. According to the wife, nursing home staff refused her requests for assistance, told her in a caustic voice that there was no emergency, implied that she overreacted and was crazy, and falsified chart records. The Court of Appeals affirmed dismissal of the claim for outrage.

In *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 845 N.E.2d 792, 300 Ill. Dec. 903 (2006), a mother sued her obstetrician for damages suffered by her son during birth. The mother alleged that the physician attempted to conceal the injuries sustained by the boy by fraudulently telling her that the size of the baby's head necessitated a caesarean section. The court summarily dismissed a claim for intentional infliction of emotional distress.

In *Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24 (2006), Dr. Jeffrey Kreutzer performed an independent medical examination on Nancy Harris, who claimed a brain injury as a result of an automobile accident. Harris claimed that Dr. Kreutzer verbally abused her, raised his voice at her, caused her to cry, and accused her of being a faker and malingerer. The Virginia Supreme Court affirmed dismissal of the claim of outrage. The

court characterized the physician's conduct as insensitive and demeaning, but not outrageous under caselaw.

In *Hart v. Child's Nursing Home Co.*, 298 A.D.2d 721, 749 N.Y.S.2d 297 (2002), the plaintiffs complained about the care of their mother in a nursing home. The plaintiffs alleged that nursing staff threatened them with physical violence, otherwise harassed them, interfered in their visits with their mother, and provided them inaccurate information regarding their mother's health and death. The reviewing court affirmed the trial court's dismissal of the action for outrage. The conduct of the nursing staff did not transcend the bounds of human decency.

In *Albert v. Solimon*, 252 A.D.2d 139, 684 N.Y.S.2d 375 (1998), Crystal Albert sued her physician, Ezzat Solimon. The doctor's nurse showed Albert and her service dog to an examination room. When Dr. Solimon entered the room, the dog's head and mouth lay on the examination table. The physician screamed: what is the dog doing here? An upset Albert rushed out of the room with her dog. The reviewing court affirmed dismissal of the cause of action for intentional infliction of emotional distress because the conduct, viewed in the light most favorable to Albert, was not sufficiently outrageous in character and extreme in degree as to exceed all bounds of decency.

Finally, in *C.M. v. Tomball Regional Hospital*, 961 S.W.2d 236 (Tex. App. 1997), plaintiff sought treatment at the hospital after being raped. She testified that hospital staff treated her "like dirt," told her that the hospital does not treat rape victims, suggested that

she lost her virginity by riding a bike or horse, and interviewed her in a rude and insensitive manner in a public waiting room. The Court of Appeals affirmed summary dismissal of a claim for intentional infliction of emotional distress.

A plaintiff's evidence of the defendant's behavior should not be viewed in isolation, but considered in the context of the undisputed facts concerning the entire relationship between the parties. *Ortberg v. Goldman Sachs Grp.*, 64 A.3d at 163 (D.C. 2013); *Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 192 (Tex. Ct. App. 2005). The court should consider the totality of the evidence pertaining to the defendant's conduct. *Reigel v. SavaSeniorCare LLC*, 292 P.3d at 991 (Colo. Ct. App. 2011).

Diane Christian claims that Dr. Antoine Tohmeh outrageously attempted to avoid liability by denying she experienced cauda equina syndrome. Nevertheless, Dr. Tohmeh referred Christian to a gynecologist, neurologist, bowel specialist, and urologist. Referring a patient to a number of specialists is not the conduct of a physician seeking to avoid liability. Christian emphasizes that the neurologist did not study her nerve conduction in the critical area of her spine, and she suggests Tohmeh is to blame for an incomplete nerve study. Nevertheless, no evidence suggests that Tohmeh and the neurologist conspired to hide information from Christian. The neurologist was free to perform the conduction study at levels of the spine deemed appropriate.

Diane Christian underscores Dr. Antoine Tohmeh's yelling at her in his office. Casey Christian testified that, although Dr. Tohmeh raised his voice, Tohmeh corrected

himself and apologized. Neither Diane nor Casey Christian were angry or upset when they left the appointment.

## CONCLUSION

We affirm in part and reverse in part the trial court's dismissal of plaintiffs Christians' claim. We affirm the summary judgment dismissal of the Christians' cause of action for intentional infliction of emotional distress. We reverse the summary judgment dismissal of the Christians' cause of action for medical malpractice.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

38