# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE of WASHINGTON, | No. 86109-3-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JUAN FLORES-GOMEZ, | |
| Appellant. | |

FELDMAN, J. — Juan Flores-Gomez appeals his convictions and sentence for murder in the first degree and a hate crime offense after he stabbed to death his ex-wife, Lilyjane Flores-Nguyen, upon discovering she had begun dating a Black man. Because sufficient evidence supports the convictions and Flores-Gomez has not otherwise established an entitlement to relief, we affirm.

I

Flores-Gomez met Lilyjane when she was living in Vietnam with her daughter, Jenny Nguyen.[1] Flores-Gomez and Lilyjane married, and they had a daughter, H.F.N., in 2009. Shortly thereafter, the family moved into an apartment in Seattle. Around 2016, Flores-Gomez and Lilyjane divorced, and Flores-Gomez

_____

[1] For clarity, we refer to Lilyjane and Jenny by their first names, and we refer to Lilyjane's younger daughter, H.F.N., by her initials because she is a minor child.

moved into another apartment located within a 10-minute walk from Lilyjane's apartment.

In 2020, Lilyjane began dating a police officer, Damien Taylor. On October 7, 2020, around 12:30 p.m., Flores-Gomez went to Lilyjane's apartment to drop off H.F.N. When he entered the apartment, he encountered Taylor and learned Taylor was dating Lilyjane. Flores-Gomez confronted Taylor and claimed he was still married to Lilyjane. Flores-Gomez then called 911 and yelled to the operator within earshot of Taylor, who is Black, that "[m]y wife is dating a Black beast" and "[t]here's a trespasser in my home."

After calling 911, Flores-Gomez became "extremely upset," kneeled before Lilyjane, begged her to "take him back," and told her she "shouldn't be . . . having sex with a Black man." Flores-Gomez also told Taylor, "You make me even more ashamed of you Black people." When Lilyjane told Flores-Gomez to leave, he went into the courtyard of the apartment complex and yelled, among other things, that he was "ashamed that Lily's having sex with a Black man." Several hours later, Flores-Gomez returned to Lilyjane's apartment carrying roses and apologized for "causing a scene."

Over the course of that night and the following morning, Flores-Gomez made 13 phone calls to Lilyjane and sent her 123 text messages. By way of example, Flores-Gomez made the following statements:

- "Please, break up with that ugly black man. Stop seeing him. . . . God wants you to stop seeing this black man from Satan."

- "Your parents will never approve a black man instead of me. And God is very sad about your mistake."

- "Do not have any contact with the black man, please. Block his telephone number and tell him to leave you alone. . . . Your parents would never accept a black man. Your family would not accept you with a black man."

- "Please . . . pray a lot and choose to serve the Lord and not a black man. God is testing you."

- "I don't want that black man near your house. I worry very much about my child being raped."

- "You have a Satanic infatuation with the black man. You have been possessed by the Devil."

- "Please, stop seeing the black man."

Flores-Gomez did not stop texting and calling Lilyjane until approximately 8 a.m. the next morning.

Then, at 8:44 a.m., Flores-Gomez appeared at the front door of Lilyjane's apartment and rang the doorbell. When Lilyjane answered the door, Flores-Gomez begged her to "come back to him," but she refused and asked him to leave. Flores-Gomez then told Lilyjane he would leave if she brought him a glass of water, and Lilyjane went into the kitchen and began filling a glass with water. While she did this, Flores-Gomez followed her into the kitchen, walked to a knife block on the kitchen counter behind her, grabbed a 5-inch knife, and began stabbing her in the back.

Flores-Gomez stabbed Lilyjane over 10 times on various parts of her body. While he was stabbing her, H.F.N. came into the kitchen and grabbed him in an attempt to pull him away, but he held off H.F.N. and continued stabbing Lilyjane. Flores-Gomez did not stop stabbing Lilyjane until Taylor, who heard these events unfold from upstairs, entered the kitchen with his firearm drawn, pointed it at

Flores-Gomez, and commanded him to drop the knife. These events were captured on video by a security camera that Lilyjane had installed in her kitchen. Police responded to the neighbors' 911 calls and arrested Flores-Gomez. Lilyjane was transported to the hospital and pronounced dead at 9:24 a.m.

The State charged Flores-Gomez with two counts: (1) murder in the first degree and (2) a hate crime offense. With respect to count 1, the State further alleged that Flores-Gomez was armed with a deadly weapon at the time of the offense and that the offense involved an aggravating factor under RCW 9.94A.535(3), namely that it involved domestic violence and occurred within sight or sound of the victim's or the offender's minor child. Following a jury trial, the jury convicted Flores-Gomez on both counts 1 and 2 as charged and found by special verdicts with respect to count 1 that he was armed with a deadly weapon and that the crime was an aggravated domestic violence offense. The sentencing court imposed an exceptional sentence above the standard range totaling 516 months of incarceration. Flores-Gomez appeals.

II

Flores-Gomez challenges his conviction and sentence on multiple grounds. We address each in turn.

A.    Jury instruction regarding premeditation

Flores-Gomez argues he is entitled to a new trial based on instructional error. We disagree.

Flores-Gomez's argument relates to jury instruction 11, which is based on 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.01.01, at 425 (5th ed. 2021) (WPIC) and defines "premeditated" as follows:

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

Flores-Gomez argues the instruction unconstitutionally lowered the prosecution's burden of proof and constituted a judicial comment on the evidence because the phrase "some time, however long or short," refers to a shorter period of time than necessary to establish premeditation under RCW 9A.32.020(1), which provides that "the premeditation required in order to support a conviction of the crime of murder in the first degree must involve more than a moment in point of time."

As argued by the State, Flores-Gomez waived his challenges to instruction 11 because he did not object to it below. The failure to timely object usually waives a claim of instructional error on appeal. RAP 2.5(a); *State v. Williams*, 159 Wn. App. 298, 312, 244 P.3d 1018 (2011). Notwithstanding that rule, a defendant may raise a claim of error for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). "In order to benefit from this exception, 'the appellant must identify a constitutional error and show how the alleged error actually affected the [appellant]'s rights at trial.'" *Gordon*, 172 Wn.2d at 676 (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). To determine if this exception is applicable, "[i]t is proper to 'preview' the merits of the constitutional argument to

determine whether it is likely to succeed." *State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009) (quoting *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)).

Division Two of our court recently rejected the same argument that Flores-Gomez presents here. In *State v. Hribar*, 34 Wn. App. 2d 546, 549, 569 P.3d 743 (2025) (published in part), a defendant charged with murder in the first degree admitted to shooting the victim with a shotgun but denied having acted with premeditation. At trial, the court gave a jury instruction, also numbered jury instruction 11, based on WPIC 26.01.01 that was identical to the instruction given at Flores-Gomez's trial. *Id.* at 552-53. On appeal from his conviction, the defendant argued, like Flores-Gomez, that instruction 11 "misstated the law on premeditation, which reduced the State's burden of proof and violated his due process rights." *Id.* at 553. The defendant also argued that "because jury instruction 11 misstated the law of premeditation, giving the instruction amounted to an unconstitutional judicial comment on the evidence." *Id.* at 557.

Division II disagreed with both arguments. As to the argument that the instruction lowered the State's burden of proof, the court looked to the plain language of RCW 9A.32.020(1) and interpreted the phrase "moment in point of time" as used therein to "refer[] to a minute portion of time, an instant, having a minimum duration." *Id.* at 556. Based on this plain meaning, the court concluded that under RCW 9A.32.020(1), "premeditation must involve *more than* a short, brief, or infinitesimal space of time having minimum duration." *Id.* The court then

concluded that although WPIC 26.01.01 "does not contain the term 'more than,'" the instruction comports with RCW 9A.32.020(1):

> The first sentence of WPIC 26.01.01 states the primary definition: "Premeditation means thought over beforehand." The second sentence of WPIC 26.01.01 requires "any deliberation." Even the last sentence of WPIC 26.01.01 states that the design to kill must be "deliberately formed." . . . A rational juror would understand that thinking over something beforehand and deliberation requires *more than* a very short period of time.
>
> WPIC 26.01.01 then states the statutory standard: "Premeditation must involve more than a moment in point of time." And the last sentence follows. The last sentence reasonably can be understood as explaining only the phrase "a moment in point of time"; a moment in point of time can be very short. With this understanding, the last sentence necessarily incorporates the "more than" requirement of the previous sentence. Premeditation requires *more than* some time, however short.

*Id.* at 556-57. The court further observed that its interpretation "is consistent with the long line of Supreme Court cases that have approved of WPIC 26.01.01," and it declined to "adopt an interpretation of WPIC 26.01.01 that contradicts those cases." *Id.* at 557 (citing *State v. Schierman*, 192 Wn.2d 577, 651, 438 P.3d 1063 (2018)). Based on this analysis, the court held "WPIC 26.01.01 does not misstate the law on premeditation, and the trial court did not err in giving jury instruction 11." *Id.* And because instruction 11 did not misstate the law on premeditation, the court likewise held "the trial court did not unconstitutionally comment on the evidence when it gave jury instruction 11." *Id.* at 558.

Because *Hribar* is well-reasoned, persuasive, supported by Washington Supreme Court precedent, and directly on point here, we follow *Hribar* and hold instruction 11 did not unconstitutionally lower the State's burden of proof or amount to a comment on the evidence at Flores-Gomez's trial. Based on these holdings,

Flores-Gomez has not met his burden of showing a manifest error affecting his constitutional rights and we decline to review this claim of error. *See State v. Edwards*, 171 Wn. App. 379, 387, 294 P.3d 708 (2012) (defendant waived claim of instructional error by failing to object below and failing to show manifest constitutional error on appeal).

B.    Sufficiency of evidence supporting murder conviction

Flores-Gomez next argues the State "presented insufficient evidence to prove the essential element of premeditated intent" with respect to his conviction for murder in the first degree. We disagree.

To convict Flores-Gomez of murder in the first degree, the jury instructions required the State to prove in relevant part that he "acted with intent to cause the death of" Lilyjane and that "the intent to cause death was premeditated." The court also gave instruction 11 (quoted above), which stated that premeditation "requires some time, however long or short, in which a design to kill is deliberately formed" and "must involve more than a moment in point of time." Washington case law similarly defines "premeditation" as "the deliberate formation of and reflection upon the intent to take a human life" which "involves thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Allen*, 159 Wn.2d 1, 7-8, 147 P.3d 581 (2006) (internal quotation marks omitted).

Our Supreme Court has observed that "[f]our characteristics of the crime are particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing." *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995). "The second and third factors can be further combined as

- 8 -

evidence of planning." *Id.* "[A] wide range of proven facts will support an inference of premeditation." *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999). Relevant here, these facts include traveling to a location where the defendant knows the victim will be present,[2] killing the victim using a knife from the kitchen, where he directed the victim to go,[3] attacking the victim from behind,[4] inflicting multiple injuries,[5] and continuing to attack the victim as they struggle and attempt to defend themselves.[6]

There is ample evidence supporting the jury's finding that Flores-Gomez acted with premeditated intent in killing Lilyjane. As to motive, the record shows Flores-Gomez killed Lilyjane due to jealousy and racism. When Flores-Gomez discovered Lilyjane was dating Taylor on the day before the murder, he became "extremely upset" and pleaded with Lilyjane to "take him back" and end her relationship with Taylor, which she refused to do. Flores-Gomez referred to Lilyjane as his "wife," not his ex-wife, and claimed that Lilyjane's apartment was "my home." Additionally, Flores-Gomez was obsessed with Taylor's race. When he first learned Lilyjane was dating Taylor, Flores-Gomez criticized her for dating a Black man and told her she "shouldn't be . . . having sex with a Black man." The tirade of racist text messages Flores-Gomez sent to Lilyjane in the hours preceding the murder (only some of which are quoted above) reiterated these themes and

---

[2] *Id.* at 832-33.
[3] *State v. Ortiz*, 119 Wn.2d 294, 313, 831 P.2d 1060 (1992).
[4] *Allen*, 159 Wn.2d at 8; *State v. Ollens*, 107 Wn.2d 848, 853, 733 P.2d 984 (1987); *State v. Notaro*, 161 Wn. App. 654, 672, 255 P.3d 774 (2011).
[5] *State v. Gentry*, 125 Wn.2d 570, 600, 888 P.2d 1105 (1995); *Ortiz*, 119 Wn.2d at 313; *Ollens*, 107 Wn.2d at 853; *Notaro*, 161 Wn. App. at 672.
[6] *Allen*, 159 Wn.2d at 8; *State v. Clark*, 143 Wn.2d 731, 769-70, 24 P.3d 1006 (2001); *Gentry*, 125 Wn.2d at 599; *Ortiz*, 119 Wn.2d at 312-13.

stressed that she would suffer various consequences if she did not resume her relationship with him and stop dating Taylor.

The record also contains evidence of planning. Flores-Gomez first learned Lilyjane was dating Taylor when he encountered them at her apartment around 12:30 p.m. on October 7, 2023—roughly 16 hours before he killed her. Flores-Gomez then left Lilyjane's apartment and returned the following morning. When she refused his final request to "come back to him," Flores-Gomez promised to leave if she would give him a glass of water. Given that Flores-Gomez previously resided in the apartment and had been inside of it just the day before, even if he did not procure the knife beforehand, a rational juror could infer that he knew a knife was located in the kitchen and that he devised his request for water as a ruse to gain access to that weapon to kill Lilyjane. And after Flores-Gomez gained access to the apartment, he walked to the knife block on the kitchen counter, selected a 5-inch knife, and began stabbing Lilyjane while she was filling up a glass with water.

Lastly, the method of killing evinces premeditation. Flores-Gomez surprised Lilyjane by attacking her from behind. He continued to repeatedly stab her for almost one full minute as she struggled to defend herself and as their daughter attempted to physically restrain him. Flores-Gomez stabbed Lilyjane over 10 times during the attack and inflicted wounds on her head, neck, chest, back, shoulder, and arm. Several of these stabs inflicted wounds to critical organs like the aorta, pulmonary artery, and lung. In sum, based on the foregoing evidence regarding motive, planning, and the method of killing, a rational juror

could find Flores-Gomez acted with premeditation in killing Lilyjane. *See State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) ("[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."); *see also State v. Gentry*, 125 Wn.2d 570, 598, 888 P.2d 1105 (1995) ("Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial.").

Flores-Gomez argues, as he did below, that the killing was "spontane[ous]" instead of premeditated because he had never previously been violent toward Lilyjane, arrived at Lilyjane's apartment without a weapon, attacked her "in broad daylight" in front of a security camera without attempting to conceal his actions, and did not "pause between wounds long enough to deliberate." This argument ignores the governing standard of review for sufficiency of the evidence claims, which requires that we defer to the jury's determination as to the persuasiveness of the evidence. *Salinas*, 119 Wn.2d at 201. While the evidence cited by Flores-Gomez could support an argument that he did not act with premeditation, Flores-Gomez ignores the other evidence discussed above from which a rational juror could infer that he did. *See State v. Couch*, 44 Wn. App. 26, 30, 720 P.2d 1387 (1986) (evidence supporting a conviction "need not be inconsistent with a hypothesis of innocence"). The jury did not find Flores-Gomez's argument persuasive, and we decline to disturb that determination on appeal. *See State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999) ("An essential function of the fact finder is to discount theories which it determines unreasonable because

the finder of fact is the sole and exclusive judge of the evidence, the weight to be given thereto, and the credibility of witnesses.").

C.   Sufficiency of evidence supporting hate crime offense

Flores-Gomez asserts the State presented insufficient evidence that he committed a hate crime offense. We disagree.

To convict Flores-Gomez of a hate crime offense, the jury instructions required the jury to find beyond a reasonable doubt (among other elements not at issue here) that Flores-Gomez "caused physical injury to Lilyjane Flores-Nguyen" and that he did so "because of his perception of the race of Damien Taylor." The jury instruction was based on the former version of RCW 9A.36.080(1)(a), in effect at the time of the offense,[7] which provided in relevant part that "[a] person is guilty of a hate crime offense if he or she maliciously and intentionally commits one of the following acts because of his or her perception of the victim's race . . . : (a) Causes physical injury to the victim or another person." Former RCW 9A.36.080(1) (effective July 28, 2019 to July 22, 2023). "Proof that the accused committed a prohibited act 'because of' the victim's membership in a protected category is characterized as the element of 'victim selection.'" *State v. Johnson*, 115 Wn. App. 890, 896, 64 P.3d 88 (2003) (quoting *State v. Pollard*, 80 Wn. App. 60, 64-65, 906 P.2d 976 (1995)). Flores-Gomez argues the State failed to prove this "victim selection" element because Lilyjane did not belong to the same racial group as Taylor and Taylor did not suffer any physical injury.

---

[7] Flores-Gomez does not challenge the validity of RCW 9A.36.080, nor does he argue that the to-convict instruction regarding the hate crime offense with which he was charged misstated the law.

- 12 -

Resolving this issue requires us to interpret former RCW 9A.36.080(1)(a). Contrary to Flores-Gomez's argument, the plain language of the statute, quoted above, accounts for scenarios where a defendant physically injures one person because of the defendant's perception of another person's race. The statute provides that a defendant is guilty of a hate crime offense if he or she "maliciously and intentionally" commits one of the enumerated actions "because of his or her perception of the victim's race" or other protected status. Former RCW 9A.36.080(1). Thus, the "victim" of the hate crime offense is the person who the defendant perceives to belong to the protected category. But the text of the statute does not limit its scope to only those actions by the defendant that affect the victim; it expressly encompasses "acts" by the defendant that "[c]ause[] physical injury to the victim *or another person*." RCW 9A.36.080(1)(a) (emphasis added). Restated, the statute provides that a defendant is guilty of a hate crime offense if the defendant "maliciously and intentionally" "[c]auses physical injury to . . . another person" "because of [the defendant's] perception of the victim's race." *Id.* In this case, Taylor is the "victim" and Lilyjane is "another person" who was injured because of Flores-Gomez's perception of Taylor's race. The to-convict instruction given in Flores-Gomez's trial (also quoted in part above) accurately reflects these designations.

Moreover, a related statute, RCW 9A.36.078, confirms the legislature intended for the hate crime offense statute to criminalize a defendant's racially motivated actions toward someone other than the victim belonging to that racial group. It states:

> The legislature finds that crimes and threats against persons because of their race, color, religion, ancestry, national origin, gender, sexual orientation, gender expression or identity, or mental, physical, or sensory disabilities are serious and increasing. The legislature also finds that crimes and threats are often directed against *interracial couples* and their children or couples of mixed religions, colors, ancestries, or national origins because of bias and bigotry against the race, color, religion, ancestry, or national origin *of one person in the couple or family*. The legislature finds that the state interest in preventing crimes and threats motivated by bigotry and bias goes beyond the state interest in preventing other felonies or misdemeanors . . . that are not motivated by hatred, bigotry, and bias, and that prosecution of those other crimes inadequately protects citizens from crimes and threats motivated by bigotry and bias. Therefore, the legislature finds that protection of those citizens from threats of harm due to bias and bigotry is a compelling state interest.

*Id.* (emphasis added). Lilyjane is necessarily included among "those citizens" the hate crime offense statute is designed to protect given that she was in an interracial relationship and was killed because of Flores-Gomez's hatred, bias, and bigotry against the other person in that relationship, Taylor, due to his race.

Flores-Gomez's contrary interpretation of RCW 9A.36.080(1) mistakenly focuses exclusively on the term "victim" and ignores the phrase "another person." Such a narrow interpretation of the statute violates the rule of statutory interpretation requiring us "to construe the enactment as a whole, and to give effect to *all* language used." *See In re Est. of Kerr*, 134 Wn.2d 328, 335, 949 P.2d 810 (1998) (quoting *Omega Nat'l Ins. Co. v. Marquardt*, 115 Wn.2d 416, 425, 799 P.2d 235 (1990)). For this same reason, the cases upon which Flores-Gomez relies (*State v. Pervez*, 15 Wn. App. 2d 265, 272-74, 478 P.3d 103 (2020), and *State v. Landsiedel*, 165 Wn. App. 886, 892-93, 269 P.3d 347 (2012)) are inapposite

because they solely interpreted the meaning of "victim" under RCW 9.94A.670.[8] In effect, Flores-Gomez asks us to rewrite the statute to remove the phrase "another person," but "[i]t is not this court's job to remove words from statutes." *State v. Reis*, 183 Wn.2d 197, 215, 351 P.3d 127 (2015).

In sum, we hold that under the plain language of former RCW 9A.36.080(1)(a), a defendant is guilty of a hate crime offense where the defendant maliciously and intentionally physically injures one person because of the defendant's perception of another person's race. And based on this holding, we conclude sufficient evidence supports Flores-Gomez's conviction for a hate crime offense. As recounted above, Flores-Gomez harbored a deep-seated racial animosity toward Taylor, the victim, because Taylor is Black. And there is overwhelming evidence, undisputed by Flores-Gomez, that Flores-Gomez resented Lilyjane for being in an interracial relationship with Taylor. Because any rational juror could find Flores-Gomez caused physical injury to Lilyjane because of his perception of Taylor's race, we conclude sufficient evidence supports his conviction for a hate crime offense.

D.    Character evidence

Flores-Gomez contends the trial court abused its discretion by allowing Jenny to testify, over his objection, that he had previously told her not to be friends with Black kids because "they could be violent or just, in general, not good kids to be friends with" and that "[t]here was one instance where I was waiting at the bus

---

[8] This Special Sex Offender Sentence Alternative (SSOSA) statute defines the term "victim" and requires the sentencing court to consider the victim's opinion whether the offender should receive a SSOSA.

stop with a friend who was [B]lack, and [Flores-Gomez] did pull me away and scolded me for interacting with her." Flores-Gomez argues this evidence was inadmissible under ER 404(b). We disagree.

Under ER 404(b), evidence of a defendant's other crimes, wrongs, or acts is presumptively inadmissible to "prove character and show action in conformity therewith." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). But this evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). To admit evidence of a defendant's prior bad acts over an ER 404(b) objection, the trial court must conduct a four-part analysis, which requires the court to "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). We review a trial court's admission of evidence over an ER 404(b) objection for abuse of discretion. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

The trial court below conducted the required analysis and concluded these statements were admissible. Relevant here, the court explained:

> I do find by a preponderance of the evidence that these events occurred . . . .
>
> In terms of the purpose for which the evidence will be admitted, part of the State's theory is that the defendant was motivated by a deeply held racial animus when he murdered his ex-wife, and also when he committed a hate crime against Mr. Taylor.

Evidence that the defendant holds or has held racist beliefs over time, I think is material to the State's purpose. It's relevant. . . .

. . . [T]he Court has already ruled that the jury is going to hear the defendant's own statements about Black people, many of which are not unfairly prejudicial, but prejudicial to the defendant's case, certainly. They do not cast him in a pleasant light.

And I don't think it is unfairly prejudicial to include this information . . . . I think the probative value is significant and the prejudicial effect, while it will be prejudicial, will not be unfairly prejudicial.

Flores-Gomez challenges the trial court's rulings with respect to the second, third, and fourth parts of its ER 404(b) analysis.

Regarding the second prong, the State offered Flores-Gomez's prior statements to prove motive. "[M]otive goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act." *Powell*, 126 Wn.2d at 259. "'[E]vidence of previous . . . ill-feeling is admissible to show motive.'" *Id.* at 260 (quoting *State v. Hoyer*, 105 Wash. 160, 163, 177 P. 683 (1919)); *see also State v. Arredondo*, 188 Wn.2d 244, 259, 394 P.3d 348 (2017) (evidence was admissible to prove motive because "it spoke to [the defendant's] animosity towards people" who were members of a different gang) (internal quotation marks omitted).

As to the third prong of the ER 404(b) analysis, "[e]vidence is relevant and necessary if the purpose of admitting the evidence is of consequence to the action and makes the existence of the identified fact more probable." *Powell*, 126 Wn.2d at 259. Here, motive—specifically racial motivation—is an essential element of the hate crime offense. To convict Flores-Gomez of the hate crime offense, the State had to prove that he maliciously and intentionally caused physical injury to Lilyjane

"because of his perception of the race of Damien Taylor." The State did not introduce Flores-Gomez's prior statements to show he had a propensity to commit hate crimes but, rather, to show he harbored racist animosity toward Black people. Because Flores-Gomez's prior statements demonstrated that he harbored such animosity, they were directly relevant to proving an element of the hate crime offense. The trial court did not abuse its discretion in ruling that these prior statements were relevant and admissible for a proper non-propensity purpose.

As to the fourth prong, for other act evidence to be admitted, "its probative value must be shown to outweigh its potential for prejudice." *State v. Vazquez*, 198 Wn.2d 239, 257, 494 P.3d 424 (2021). "The trial court is vested with wide discretion in determining if the danger of unfair prejudice outweighs its probative value." *State v. Maesse*, 29 Wn. App. 642, 648, 629 P.2d 1349 (1981). Here, the trial court determined that the probative value of Flores-Gomez's prior statements "is significant." Indeed, racial animus is, for obvious reasons, an essential element of establishing a hate crime, and ER 404(b) "is not intended to deprive the state of relevant evidence necessary to establish an essential element of its case." *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995).

Having found that the statements at issue have at least some probative value, the court then determined that "while [these statements] will be prejudicial, [they] will not be unfairly prejudicial" given that "the jury is going to hear the defendant's own statements about Black people." These statements by the trial court belie Flores-Gomez's assertion that "the court did not adequately analyze whether the prejudicial impact outweighed the probative value of the evidence."

Moreover, the trial court mitigated the prejudice stemming from this evidence by giving the following limiting instruction:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony from Jenny Nguyen regarding whether Mr. Flores-Gomez made racially biased remarks prior to October 7, 2020, and may be considered by you only for the purpose of considering Count 2 – Hate Crime. It may not be considered by you for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Notably, this instruction was proposed by Flores-Gomez and accepted with the trial court's edit (adding "racially" before "biased"). As the instruction clearly provides, the prior statements are admissible *solely* on the hate crime offense and cannot be considered by the jury in determining guilt on the murder offense. We presume the jury followed this instruction. *Arredondo*, 188 Wn.2d at 264 ("Juries are presumed to follow the court's instructions, absent evidence to the contrary."). On this record, there was no abuse of discretion.

E.    Fact finding and sentencing

Flores-Gomez argues the trial court violated his right to a trial by jury by imposing an exceptional sentence based on "judge-found facts" that were not submitted to a jury and proved beyond a reasonable doubt. We disagree.

The sentencing court in this case imposed an exceptional sentence in accordance with the Sentencing Reform Act (SRA), chapter 9.94A RCW. The jury in Flores-Gomez's trial was instructed that if it found him guilty of murder in the first degree as charged in count 1, it "must determine if the following aggravating circumstance exists: Whether the crime is an aggravated domestic violence offense." A separate instruction read:

To find that this crime is an aggravated domestic violence offense, each of the following two elements must be proved beyond a reasonable doubt:

(1) That the victim and the defendant were intimate partners; and

(2) That the offense was committed within the sight or sound of the victim's or defendant's child who was under the age of 18 years.

These jury instructions and the special verdict form were based on RCW 9.94A.535(3), which lists several aggravating circumstances "that can support a sentence above the standard range," one of which is that "[t]he current offense involved domestic violence, as defined in RCW 10.99.020, . . . and . . . occurred within sight or sound of the victim's or the offender's minor children under the age of eighteen years." RCW 9.94A.535(3)(h)(ii).

After deliberating, the jury entered a special verdict in which it found unanimously and beyond a reasonable doubt that "the crime was an aggravated domestic violence offense." Relying on the jury's finding as to this aggravating circumstance, the sentencing court imposed an exceptional sentence above the standard range for count 1 pursuant to RCW 9.94A.535. This statute provides, "The court may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence." *Id.* In justifying the exceptional sentence in this case, the court referenced the jury's finding as to the aggravating circumstance and stated, "Based on that . . . aggravator and considering the purposes of the [SRA], I find a substantial and compelling reason justifying an exceptional sentence." The court ultimately imposed a total sentence

of confinement of 516 months, which exceeds the standard statutory range for the offense by 159 months (when factoring in the deadly weapon enhancement). The court later issued written findings of fact and conclusions of law memorializing this ruling.

Flores-Gomez does not argue that the sentencing court's imposition of an exceptional sentence violated the SRA. Rather, he contends his "exceptional sentence violated his right to a trial by jury because a predicate finding of fact— that 'substantial and compelling reasons' supported the sentence—was found by the trial court, not the jury." Flores-Gomez also argues more broadly that the exceptional sentencing scheme under the SRA is "[c]ontrary to the Sixth Amendment" in light of the United States Supreme Court's opinion in *Hurst v. Florida*, 577 U.S. 92 (2016).

We rejected these same arguments in *State v. Sage*, 1 Wn. App. 2d 685, 407 P.3d 359 (2017), *rev. denied*, 191 Wn.2d 1007 (2018), *cert. denied*, 586 U.S. 1197 (2019). Because the jury in Sage's trial "entered special verdict forms setting out specific findings that the aggravating circumstances [under RCW 9.94A.535(3)] had been proved beyond a reasonable doubt," we held the trial court, in concluding that these findings presented "substantial and compelling" grounds for an exceptional sentence, "properly analyzed and articulated the basis for the exceptional sentence without engaging in prohibited fact finding." *Id.* at 710. Our holding in *Sage* was based on our Supreme Court's "recogni[tion] that once the jury by special verdict makes the factual determination whether aggravating circumstances have been proved beyond a reasonable doubt, '[t]he

trial judge [is] left only with the legal conclusion of whether the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence.'" *Id.* at 708 (quoting *State v. Suleiman*, 158 Wn.2d 280, 290-91 & 291 n.3, 143 P.3d 795 (2006)).

Like Flores-Gomez here, Sage relied heavily on the United States Supreme Court's opinion in *Hurst*. We rejected Sage's reliance on *Hurst* for the following reasons:

> In *Hurst*, the Supreme Court held Florida's death penalty procedure violated the defendant's Sixth Amendment right to a jury trial because the jury's findings of aggravating factors were advisory, resulting in prohibited fact finding by the judge. But the Florida statute at issue expressly state that the jury findings were "advisory." Fla. Stat. § 921.141 (2004). By contrast, under Washington procedure here, the jury exclusively resolves the factual question whether the aggravating circumstances have been proven beyond a reasonable doubt.

*Id.* at 710 n.86 (citing *Hurst*, 577 U.S. 92). In *State v. Johnson*, we similarly ruled, based on *Sage*, that a sentencing court's determination as to whether "substantial and compelling reasons" support an exceptional sentence "is a legal one, not a factual one" and therefore does not violate the Sixth Amendment or *Hurst*. 29 Wn. App. 2d 401, 424-26, 540 P.3d 831, *rev. denied*, 2 Wn.3d 1035, *cert. denied*, 145 S. Ct. 771 (2024).

Because Flores-Gomez advances no novel theory as to why our analysis in *Sage* is incorrect, we reject his argument that the sentencing court violated his right to a jury trial by imposing an exceptional sentence.[9]

---

[9] In the assignments of error section in his opening brief, Flores-Gomez also alleges his sentence violates article I, section 22 of the Washington Constitution. But the argument section of his brief does not reference the Washington Constitution and, instead, solely argues his sentence violates the United States Constitution. We decline to address whether Flores-Gomez's sentence violates

F.     Right to allocution

Lastly, Flores-Gomez asserts the trial court violated his right to allocution by "cutting [him] off when he was speaking during sentencing." We disagree.

The right to allocution under Washington law stems from RCW 9.94A.500(1), which states in relevant part that "[t]he court shall . . . allow arguments from . . . the offender . . . as to the sentence to be imposed." Our Supreme Court has explained that allocution "is the defendant's opportunity to plead for mercy and present any information in mitigation of sentence." *State v. Canfield*, 154 Wn.2d 698, 701, 116 P.3d 391 (2005). The court has also clarified allocution "is not intended to advance or dispute facts." *State v. Lord*, 117 Wn.2d 829, 897-98, 822 P.2d 177 (1991).

*State v. Ellison*, 186 Wn. App. 780, 346 P.3d 853 (2015), is instructive on the issue of when a trial court may limit a defendant's exercise of the right to allocution. In that case, Ellison made "extensive remarks" during his allocution in which he "sang a short religious song and spoke about various topics not clearly related to the sentencing proceeding." *Id.* at 783. When Ellison "began to protest his innocence and accuse his trial attorney of lying to the court," the sentencing court "cut Ellison off, explained that the matters he related were irrelevant to the issues at hand," pronounced the sentence, and declined Ellison's request to finish his remarks. *Id.* On appeal, Division Two of our court held the sentencing court "did not abuse its discretion in cutting short Ellison's allocution" because it "let

---

the Washington Constitution. *See Christian v. Tohmeh*, 191 Wn. App. 709, 727-28, 366 P.3d 16 (2015) ("[T]his court does not review issues not argued, briefed, or supported with citation to authority.").

Ellison speak without interruption until it was clear he was using the allocution for improper purposes," namely, "testify[ing] about the facts of the case and complain[ing] about the conduct of his trial attorney." *Id.* at 785.

The present appeal presents similar circumstances. Flores-Gomez began his allocution by quoting scripture, stating that he has no criminal history, "pleading . . . for . . . mercy," stating that he has family members with medical conditions, referring to his "psychiatric issues," and recounting his childhood. When he suggested that the court visit a spiritual author's website, the court replied, "[N]ow is not the time to advise the Court about some website that you've been reading. . . . I want to hear about the matter at hand." Flores-Gomez then informed the court that he intended to read a lengthy prepared speech because "I was never allowed to exercise my constitutional right to . . . testify on my own behalf" and "I just want to continue with what happened and what led to this." The court responded, "This is your opportunity to tell the Court what you think should happen with regard to sentencing or any other information that you believe would be relevant to my evaluation of what's being asked to happen here at sentencing." The court also explained, "[W]e're . . . not relitigating the trial. This is not your chance to testify about what you believe happened or evidence that you believe the jury did not hear at the trial."

The court and Flores-Gomez exchanged similar remarks as he continued his allocution. At various points, Flores-Gomez stated that he "was a victim of domestic violence by Lilyjane," that she was "inflicting [on] me psychological abuse, physical abuse, verbal abuse," that "I don't recall what I did," that "I never

- 24 -

premeditated anything," that "it was not racially . . . motivated," that "the unconstitutional criminal justice system at King County . . . handled my legal case," that Lilyjane "had three STDs," that "I am not guilty," that Lilyjane "was always unfaithful to me," that he was under the influence of controlled substances and "had been drinking all day" the day before the murder, that he and Lilyjane "never broke up," and that "[t]he trial was unfair to me." In response, the court made statements such as "this is not the trial," "this is not the place" to "testify[] about the events leading up to the murder," and "I'm not going to let you sit here and re-traumatize the folks who are here in this courtroom by recounting the murder in a way that is highly favorable to you." Finally, as Flores-Gomez continued to deny that he planned to kill Lilyjane, the court told him "you're done" and explained:

> I'm putting an end to this. All you're doing is trying to testify about the events leading up to the murder. I have given you ample time to allocate, to explain to the Court your thoughts about what should happen at sentencing and instead you seem intent upon re-litigating the case, explaining why the trial was unfair to you, and frankly, blaming the victim for what happened.

We review this ruling for abuse of discretion. *Ellison*, 186 Wn. App. at 785.

Contrary to Flores-Gomez's argument, the trial court did not abuse its discretion, nor did it violate Flores-Gomez's right to allocution when, following multiple warnings and repeated transgressions, it finally put an end to Flores-Gomez's inappropriate attempts to reargue the facts and blame others for his crimes. Like the sentencing court in *Ellison*, the sentencing court here permitted Flores-Gomez to speak at length and cut him off only when he began relitigating the facts of the case and complaining about the perceived unfairness of his trial. Because these were not proper purposes for allocution, and because the trial court

repeatedly warned Flores-Gomez to appropriately limit his remarks, the trial court did not abuse its discretion in ruling as it did.

We affirm.

_Feldman, J._

WE CONCUR:

_Chung, J._